UTILITIES & INDUSTRIES CORPORATION, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

THE SOUTH BAY CORPORATION, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 88306, 88307. Filed March 27, 1964.

*Robert J. Casey* and *Thomas J. McCoy, Jr.*, for the petitioners.
*John J. O'Toole* and *Colin C. MacDonald, Jr.*, for the respondent.

900

OPINION

Respondent determined that petitioner South Bay realized additional capital gain in the net amount of $2,350,734.26 resulting from several adjustments in the computation of the taxable gain realized from South Bay's sale of all its assets, both tangible and intangible,

to the Suffolk County Water Authority under condemnation proceedings in 1951.

At the trial petitioner South Bay conceded the respondent's disallowance of $89,509.62 of the claimed basis for tangible properties involved in such sale and that adjustment is no longer in dispute.

The first issue herein involves respondent's disallowance of the amount of $2,314,658 claimed by petitioner South Bay as its basis for intangibles sold to the Water Authority in May 1951, and embracing intangible assets acquired from the five transferor corporations—Great South Bay, Southampton, Port Jefferson, Amityville, and Kings Park, respectively, as set out in our findings of fact.

With respect to the Great South Bay and Southampton transactions in 1925, respondent contends that the properties and assets formerly owned by each of those corporations were acquired by South Bay in connection with two separate reorganizations as defined in section 203(h) of the Revenue Act of 1924,[1] because both acquisitions resulted from mergers in which South Bay acquired all the outstanding capital stock and thence all the properties of each of those corporations with the requisite continuity of interest therein since South Bay's consideration was partly in its stock and securities. Respondent further contends that South Bay's basis for determining gain or loss on the 1951 sale of the properties in question, is the same as it would be in the hands of the transferors as required by the applicable provisions of section 113(a)(7) of the Internal Revenue Code of 1939,[2] since as therein provided the properties were acquired by South Bay in con-

---

[1] RECOGNITION OF GAIN OR LOSS FROM SALES AND EXCHANGES.

SEC. 203. (h). As used in this section and sections 201 and 204—

(1) The term "reorganization" means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation), * * *

(2) The term "a party to a reorganization" includes a corporation resulting from a reorganization and includes both corporations in the case of an acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation.

[2] SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property; except that—

* * * * * * *

(7) Transfers to corporation.—If the property was acquired—

(A) After December 31, 1917, and in a taxable year beginning before January 1, 1936, by a corporation in connection with a reorganization, and immediately after the transfer an interest or control in such property of 50 per centum or more remained in the same persons or any of them, or

* * * * * * *

then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made. This paragraph shall not apply if the property acquired consists of stock or securities in a corporation a party to the reorganization, unless acquired by the issuance of stock or securities of the transferee as the consideration in whole or in part for the transfer.

nection with reorganizations which occurred between the specified dates (after December 31, 1917, and before January 1, 1936) and with the specified interest or control remaining in the same person, in that Collins owned more than 50 percent control of both Great South Bay and Southampton, respectively, prior to the transfers and immediately thereafter more than 50 percent control of petitioner South Bay remained in Collins. Further, respondent contends that petitioner has failed to prove either the basis, if any, for the intangible properties in the hands of the transferors, or, its own *adjusted* basis for such assets at the time of the condemnation sale in 1951.

Petitioner South Bay argues that respondent's contentions with respect to reorganizations, continuity of interest, and a substituted basis are correct only if Collins individually acquired and owned controlling stock interests in Great South Bay and Southampton prior to acquisitions of all their outstanding stock by South Bay in separate independent transactions. Petitioner contends that the record supports contrary conclusions, namely, that Collins acquired stock rights and shares of stock as the agent and for the account of South Bay and thus there was not the requisite continuity of interest remaining in the prior original shareholders of the transferor corporations; that all of the steps taken by Collins and South Bay in the Great South Bay and Southampton transactions were interdependent steps in an integrated transaction *solely* for the purpose of purchasing the properties and assets of those corporations by South Bay; and that therefore its basis is cost. Petitioner further contends that its total cost in excess of each transferor's stipulated book value of the physical properties, as of the date of acquisition by South Bay, constitutes its cost basis of alleged nondepreciable intangible properties such as franchises, easements, etc., acquired at that time, without further adjustment in arriving at its own adjusted basis for determining gain on the 1951 sale.

On the record herein we conclude that petitioner South Bay has failed to prove error in respondent's determination with respect to the properties acquired in the Great South Bay and Southampton transactions. There is no convincing evidence of record to establish or even indicate that Collins was an agent acting solely on behalf of South Bay. To the contrary, the evidence discloses that Collins was acting on his own behalf and in furtherance of his own plans to bring about mergers and remain in control of the continuing corporation. Collins, acting entirely on his own behalf, first obtained an option for a controlling stock interest in Southampton and then began buying all the stock in South Bay as the nucleus of his proposed merger and while so engaged he also obtained a contract pursuant to which he acquired a controlling stock interest in Great South Bay. Collins did not assign his stock rights or transfer his purchased shares of Great

South Bay and Southampton to petitioner South Bay at the cost thereof to him acting as its agent under any prior agreement *with or* authorization by South Bay. Instead, Collins independently made stock purchases and dealt with South Bay as an individual stockholder in transferring his controlling stock interest in Great South Bay and Southampton, respectively, in separate exchanges for stock and securities of South Bay whereby he substantially increased his individual interest in and retained control of the latter corporation. Also, the facts show that Collins obtained better terms on his exchanges than did the other remaining stockholders of Great South Bay and Southampton, which was reflected in the writeup on South Bay's books in its Fixed Capital account. The transactions or steps beginning with Collins' stock acquisitions and ending with the mergers were not so integrated or interdependent as to be *solely* for the purpose of South Bay's purchase of assets. Further, there is no showing that the properties acquired by mergers could not have been acquired by direct purchase by South Bay.

In the exchange involving the Great South Bay stock, the record fails to show the specific number of shares of South Bay common or the shares of preferred and/or bonds received by Collins, but it establishes that prior thereto he owned all 850 shares of South Bay common then outstanding and in 1930 he still owned 6,500 of the 7,500 shares of common outstanding. The record does not disclose any issuance of South Bay common to Collins other than in the exchange involving Great South Bay and, therefore, it must be assumed that he received at least 5,650 such shares in the said exchange. This resulted in his remaining in control of petitioner South Bay throughout the entire period of its several acquisitions involved herein.

Petitioner South Bay has failed to establish factual circumstances warranting its contended-for conclusion that the Great South Bay and Southampton transactions of both Collins and South Bay ending in the mergers, were interdependent steps in an integrated transaction *solely* for the purpose of South Bay's purchase of the properties of those two corporations, so that there were no reorganizations and South Bay's basis for the properties acquired, is its cost. *Long Island Water Corporation*, 36 T.C. 377 (1961). In that case the facts involved in the taxpayer's ultimate acquisition of the properties of one corporation led this Court to the conclusion that certain transactions were interdependent steps of an integrated transaction for the purchase of assets and, therefore, under the rule established by cited cases, the taxpayer's basis was its cost. The facts there involved are clearly distinguished from those involved herein. In the *Long Island* case the taxpayer also acquired the assets of two other corporations through stock acquisitions and mergers which the Court found to be statutory reorganizations and accordingly held that the taxpayer's basis for

such assets was the same as it was in the hands of each of its trans-ferors. In the *Long Island* case this Court discussed at some length numerous prior cases involving varying factual circumstances attending corporate acquisitions through mergers and the rules applicable in determining whether the acquisitions were by statutory reorganizations or by purchase, for the purpose of ascertaining the proper basis in the hands of the transferee. We do not deem it necesary to rehash here what was said there.

On the record we conclude and find that the properties formerly owned by Great South Bay and Southhampton were acquired by petitioner South Bay in 1925 in connection with two separate reorganizations as defined by section 203(h) of the Revenue Act of 1924, *supra*, and that petitioner's basis is the same as it would be in the hands of the transferors as required by section 113(a)(7) of the 1939 Code, *supra*. However, as further contended by respondent, petitioner has failed to establish the basis, if any, of the intangible properties in the hands of its transferors Great South Bay and Southampton, respectively, and thus the basis petitioner was required to take at the time of its acquisitions in 1925. Furthermore, the record fails to show whether such basis at time of acquisition was subject to adjustment for depreciation or otherwise to arrive at petitioner's adjusted basis for the purpose of determining the gain" realized on the sale in 1951. Section 111(a) of the Internal Revenue Code of 1939 provides in part that "the gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the *adjusted basis* provided in section 113(b) for determining gain and section 113(b) provides in part that "the *adjusted basis* for determining gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a) adjusted as hereinafter provided." (Emphasis supplied.) The record is entirely silent on what adjustments, if any, are required by statute. On this phase of the first issue the respondent's determination is sustained.

The next phase of the first issue involves petitioner South Bay's basis for the intangible properties formerly owned by Port Jefferson, Amityville, and Kings Park. Petitioner contends that it acquired the properties of Port Jefferson and Amityville by outright purchase in 1925; that the 1927 Kings Park transactions were interdependent steps in an integrated transaction solely for the purpose of purchasing the properties of that corporation by South Bay; and that its basis for all such properties is its cost. Petitioner further contends that its total cost in excess of each transferor's stipulated book value of the physical properties, constitutes its cost basis of alleged nondepreciable intangible properties.

On brief respondent concedes that South Bay is entitled to a cost basis for the properties acquired in the Port Jefferson, Amityville, and

Kings Park transactions, but contends that it has failed to establish its cost basis, if any, for the intangible properties on the dates of acquisition thereof and its *adjusted* basis therefor on the date of the sale in 1951.

The stipulated facts show only the book value of the physical properties of each transferor on the date of South Bay's acquisition and the record fails to establish the fair market value of the tangibles and intangibles, respectively, or any other basis or foundation for a reasonable allocation to the intangibles of any portion of South Bay's total cost, even assuming on this record that cost included an amount equal to the full par value of the stock and securities issued at time of acquisition. Further, the record fails to show whether the intangibles were subject to adjustment for depreciation or otherwise in arriving at South Bay's *adjusted basis* for such properties at the time of the 1951 sale, for purposes of determining the gain thereon, as required by section 111(a) and section 113(b) of the 1939 Code, *supra*. On this phase of the first issue respondent's determination is sustained.

Accordingly, we conclude and find that petitioner South Bay has failed to sustain its burden of proof of error on the first issue involved herein.

The second issue herein involves petitioner South Bay's assignment of error in respondent's determination that it realized additional ordinary income in the amount of $53,433.36. In connection with the 1951 sale of South Bay's properties to the Water Authority, the respondent's deficiency notice reduced the "sales proceeds" by $53,433.36 in determining the amount of capital gain realized from such sale and included that amount in ordinary income as reimbursed taxes.

As of May 31, 1951, the Water Authority condemned and took over all of South Bay's properties and the net award to South Bay for such properties totaled $7,508,111.25. By a prior supplemental agreement between the Water Authority and South Bay's trustee in reorganization under which, according to the stipulation of facts, "certain personal properties not included in the condemnation were transferred to the Authority," there was included as a part of the award the amount of $53,433.36 which was "a sum equal to the amount" of South Bay's prepaid local real estate taxes levied against South Bay on December 1, 1950, while it was still the owner of the properties. Under the supplemental agreement such sum was included in the award because of doubt as to the right of the trustee to apply for refunds of prepaid taxes.

Respondent contends that South Bay surrendered or transferred for valuable consideration its *right* to a benefit it had by virtue of having prepaid its taxes and that such *right* was not a capital asset, citing *Commissioner* v. *Gillette Motor Transport, Inc.*, 364 U.S. 130

(1960), and, further, that such right was not related to any existing investment or the capitalization of a property right but rather to a benefit derived from the earning of ordinary income, citing *Anton L. Trunk*, 32 T.C. 1127 (1959), and *J. J. Shea*, 36 T.C. 577 (1961). The *Gillette Motor Transport* case held that an award representing fair rental of property was ordinary income and that the taxpayer owner's right to the use of property was not a capital asset under the circumstances there obtaining.

The *Trunk* case held that a taxpayer owner's sale of his right to a condemnation award for a prospective taking of certain front footage of his property to his lessee, resulted in a capital gain which reduced his basis of the property. The *Shea* case held that a taxpayer's payment for a release of liability under a guaranty was not a loss from the sale of a capital asset, but an ordinary loss incurred in a transaction entered into for profit. Those cases, while not exactly in point, are illuminating here.

South Bay contends that the prepaid real estate taxes included by the Authority in the total condemnation award are part of the proceeds from the sale of the properties and part of the investment which South Bay had made in its properties condemned, citing *Magruder* v. *Supplee*, 316 U.S. 394 (1942); *Van Dyke* v. *United States*, 156 F. Supp. 155 (1957); *Norman Cooledge*, 40 B.T.A. 1325 (1939); and S.M. 4122, V-1 C.B. 55 (1926). Petitioner therefore concludes that its treatment of this amount as capital gain is correct and that respondent erred in determining that it constituted ordinary income.

In the instant case South Bay prepaid local real estate taxes while it was the owner of the properties against which such taxes were assessed. No explanation for such prepayment is given, but it is obvious that the condemnation was well along and in process of being completed when the taxes were paid. The condemnation proceedings had been instituted in May of 1949, over a year and one-half before the tax levy for these taxes became effective.

While it is true that the parties to the award agreement could not change the incidence of local taxes, or the effective levy date, and the Water Authority merely paid a sum equal to such taxes as a part of the total award, it is also true that petitioner has produced no evidence whatever to establish that the reimbursement it received was for a capital asset, nor has it shown that there was a transfer of a right to file claim for a real property tax refund. We conclude and find that South Bay has not met its burden to overcome the respondent's determination that this portion of the condemnation award constituded ordinary income. We do not conceive that annual taxes or other expenses such as insurance, repairs, or maintenance constitute investment in real property or that compensation for such items, if prepaid, would be proceeds of the sale of a capital asset. As pointed

out in the *Gillette Motor Transport* case the term "capital asset" is to be construed narrowly to afford capital gains treatment only in situations typically involving the realization of appreciation in value over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in 1 year. In the instant case the parties to the agreement merely agreed that "to avoid doubt as to the right of the trustee to apply for refunds of prepaid real estate * * * taxes * * * the trustee will not apply for refunds and the Authority * * * will pay to the trustee a sum equal to the amount of such taxes prepaid."

The cases relied upon by South Bay involved claimed deductions by taxpayers for real estate taxes assumed or paid by them but which had accrued as a liability of the vendor of real property prior to the sale. In denying the deduction to vendees because they did not pay taxes that they owed, the courts have laid down the rule that payment of such taxes should be included in the vendees' purchase price of the property thereby increasing the cost basis for income tax purposes. Such cases are clearly distinguishable from the question presented here. We are not concerned with deductions for taxes or additions to the vendees' cost basis.

In this case petitioner is seeking to obtain capital gains treatment for a portion of a condemnation award paid to reimburse the property owner for prepaid real estate taxes. We hold that no right or asset, much less a capital asset, was transferred to or acquired by the Water Authority but instead South Bay's trustee merely agreed to forbear a doubtful claim against a third party, the local real estate taxing authorities. The net result of the transaction was to reimburse South Bay for a prepaid business expense and the payment of $53,433.36 under the supplemental contract as part of the total award was merely a substitute for the possible refund of the real property taxes prepaid by South Bay at an earlier date. Under such circumstances, there was no sale or transfer of a capital asset and the income derived should be taxed as ordinary income. Cf. *Hort* v. *Commissioner*, 313 U.S. 28 (1941), affirming 112 F. 2d 167 and 39 B.T.A. 922, and *J. J. Shea*, *supra*. Respondent did not err in reducing the proceeds of sale of petitioner South Bay's properties by the sum of $53,433.36 and in determining that such amount constituted additional ordinary income.

The third issue herein involves petitioner South Bay's assignment of error in respondent's determination that it realized additional ordinary income in the total amount of $605,577.85 in 1951 from the discharge of indebtedness by cancellation of a demand note for $227,960 and accrued interest deducted in prior years in the total sum of $377,617.85. The major portion of such accrued interest is identified by the stipulated facts, namely, $244,644.79 interest on the note and $113,261.24 interest on two loan accounts, both as accrued up to April

27, 1949.   The remaining amount of $19,711.82 embraced in respondent's determination of canceled accrued interest is not specifically identified.

On April 27, 1949, New York and three trade creditors of petitioner South Bay filed a petition in the U.S. District Court for the Southern District of New York for South Bay's reorganization under chapter X of the Bankruptcy Act and such petition was approved and a trustee appointed.   New York filed three claims with the trustee for debts owed to it by South Bay, two of which are involved in this issue.   One claim was for $618,261.24 composed of $505,000 principal balance on two loan accounts (for $475,000 and $30,000, respectively) and accrued interest thereon in the amount of $113,261.24 to April 27, 1949.   A second claim was for $472,604.70 composed of $227,960 principal balance due on South Bay's demand note and $244,644.79 accrued interest thereon to April 27, 1949.

The District Court, by order dated May 24, 1951, approved a proposed settlement between the court-appointed trustee and New York as a creditor, whereby the claim for South Bay's debt of $505,000 principal amount of the loan accounts was allowed in full and New York acceded to the trustee's contention that it was not entitled to the claimed accrued interest thereon and, further, South Bay's debt for the principal of the demand note and accrued interest thereon was canceled as a contribution to South Bay's capital.   At that time and for several years prior thereto New York owned at least 7,250 of the 7,500 shares (if not all thereof as stated in briefs of both parties) of the outstanding common stock of South Bay.

Respondent determined that a cancellation of South Bay's indebtedness on both the note and the loan accounts occurred in 1951, as the premise of his assertion that it thereby realized taxable income in that year.   If there was no actual cancellation of a debt as respondent argues at one point in his brief, then there is no basis for his application of the general rule that gratuitous cancellation of indebtedness, in whole or in part, results in realization of income to the debtor.   However, based upon the stipulated facts herein, we conclude and find that respondent correctly determined that there was a cancellation in 1951 of South Bay's indebtedness involved herein.

With respect to the item of $113,261.24, accrued interest on the loan accounts, the parties involved treated it as a valid debt.   Respondent determined that South Bay accrued and deducted such interest on its tax returns for prior years and the stipulated facts show that New York accrued and reported such interest as income on its tax returns for prior years.   Under the court-approved settlement the principal due on the loan accounts was recognized as a debt and allowed in full on New York's creditor claim, while as to the accrued interest thereon

the settlement between creditor and debtor used inconclusive terminology that New York acceded to the trustee's contention that it was not entitled to such interest. This was not a determination that no valid debt for interest existed. We construe the language to mean simply that, by agreement of the parties, New York would not collect the accrued interest and thereby South Bay's debt for $113,261.24 interest was canceled. The court-approved settlement specifically canceled South Bay's debt for both principal and accrued interest on the demand note by way of contribution to the capital of South Bay by its common stockholder New York.

There are two avenues of approach in viewing the tax consequences to petitioner South Bay resulting from the above-mentioned cancellations of its indebtednesses, both of which lead to the conclusion that no taxable income was thereby realized. Subsection (a) of section 29.22(a)-13 of Treasury Regulations 111,[3] in effect for taxable years beginning prior to December 31, 1951, provides that a gratuitous cancellation of indebtedness of a corporation by its stockholder constitutes a contribution to the capital of the corporation to the extent of the principal of the debt, and the courts have held that this rule applies to indebtedness embracing both principal and accrued interest regardless of prior years' treatment of such interest for tax purposes. *Commissioner* v. *Auto Strap Safety Razor Co.*, 74 F. 2d 226 (C.A. 2, 1934), affirming 28 B.T.A. 621; *Lidgerwood Manufacturing Co.* v. *Commissioner*, 229 F. 2d 241 (C.A. 2, 1956), affirming 22 T.C. 1152, certiorari denied 351 U.S. 951 (1956); and *In the Matter of Triple Z Products, Inc., Bankrupt*, an unreported case (S.D.N.Y. 1940), 27 A.F.T.R. 1164, 40–2 U.S.T.C. par. 9705. A contribution to the capital of a corporation is not income to it. Secondly, since the cancellations of South Bay's indebtednesses were in connection with a corporate reorganization confirmed under chapter X of the Bankruptcy Act, no income was thereby realized by South Bay pursuant to subsection (b)(1) of the above-cited regulation.

---

[3] Regulations 111.

SEC. 29.22(a)-13. CANCELLATION OF INDEBTEDNESS.—

(a) *In general.*—The cancellation of indebtedness, in whole or in part, may result in the realization of income. * * * In general, if a shareholder in a corporation which is indebted to him gratuitously forgives the debt, the transaction amounts to a contribution to the capital of the corporation to the extent of the principal of the debt.

(b) *Proceedings under Bankruptcy Act.*—* * * Furthermore, income is not realized in any case by a taxpayer in the case of a cancellation or reduction of his indebtedness under—

(1) a plan of corporate reorganization confirmed under * * * Chapter X of the Bankruptcy Act, as amended;

\*          \*          \*          \*          \*          \*

If, however, such plan of corporate reorganization or agreement of composition referred to in (1) to (4) above had for one of its principal purposes the avoidance of income tax, the cancellation or reduction of indebtedness, under such plan or agreement confirmed * * * under Chapter X, * * * of the Bankruptcy Act, as amended, may result in the realization of income. * * *

Respondent's position on this issue is not clear-cut. Respondent argues, *inter alia*, that considering the legal relationship of New York as sole common stockholder of its debtor South Bay and looking to substance as opposed to mere form, the purported surrender and cancellation of the demand note and accrued interest thereon was not actually a contribution to capital because it was something of no value to South Bay since the debtor and sole stockholder were one and the same person and South Bay's assets were thereby neither relieved nor increased and, further, that the purported contribution was for the purpose of disguising what was substantially a taxable transaction because in any event New York as creditor or stockholder would be paid from whatever assets South Bay owned. Respondent further argues that South Bay realized taxable gain in the entire amount of $605,577.85 in 1951, as determined by him, in spite of the provisions of the first part of subsection (b)(1) of section 29.22(a)–13 of the Regulations, *supra*, because no actual cancellation existed since South Bay remained legally obligated in any event to distribute its assets to its stockholder New York; and thus the purported cancellation is within the purview of the latter portion of subsection (b)(1) providing that if the plan of reorganization "had for one of its principal purposes the avoidance of income tax, the cancellation or reduction of indebtedness * * * may result in the realization of income." Respondent's contentions are, to say the least, confusing.

The stipulated facts herein do not present a transaction couched in mere form for the purpose of tax avoidance as opposed to real substance. Petitioners South Bay and New York, respectively, were distinct and separate taxable entities prior to, during, and subsequent to the taxable year 1951. The filing of the petition in the District Court for reorganization of South Bay under chapter X of the Bankruptcy Act, the court's appointment of a trustee, the filing of New York's claims as a creditor, and the court-approved settlement of those claims, were all matters of substance. We perceive no purpose of tax avoidance nor the disguising of what was otherwise a taxable transaction. If, in the reorganization proceeding, South Bay had been required to pay its indebtednesses to New York, such payment would not have been a taxable event as to either South Bay or New York. The cancellation of the debts relieved South Bay of accrued liabilities. New York's cancellation of the debts constituting a contribution to the capital of South Bay increased New York's capital investment in its shares of common stock of South Bay and the latter's possible distribution in liquidation at some future time has no bearing on the taxable year before us.

Our discussion of this issue has revolved around the specifically identified South Bay indebtedness owing to New York on the demand note plus interest thereon and interest on the loan accounts. The

stipulated facts do not specifically identify the remaining $19,711.82 out of the total sum of $605,577.85 embraced in respondent's determination of additional income realized in 1951 from discharge of indebtedness by cancellation. Nevertheless, assuming that there was a cancellation of additional accrued interest in the amount of $19,711.82 owing by South Bay (either to New York or some other creditor) such cancellation must of necessity have been in connection with the corporate reorganization proceeding under chapter X of the Bankruptcy Act, and accordingly no income was thereby realized by South Bay in 1951.

On the third issue herein we conclude and find that respondent erred in his determination that petitioner South Bay realized additional ordinary income in the amount of $605,577.85 in 1951 as the result of discharge of indebtedness by cancellation.

The fourth issue involves petitioner South Bay's assignment of error in respondent's determination that it is not entitled to a dividends paid credit of $165,662.73 for the taxable year 1951, as claimed under section 26(h) of the Internal Revenue Code of 1939.[4] Said section provides for the computation of the amount and the allowance of a credit in the case of a "public utility," as defined therein, on account of dividends paid during the taxable year on its "preferred stock," as defined therein and issued prior to October 1, 1942, and, further that for purposes of the credit the amount of dividends paid

---

[4] SEC. 26. CREDITS OF CORPORATIONS.

In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax—

\* \* \* \* \* \* \*

(h) CREDIT FOR DIVIDENDS PAID ON CERTAIN PREFERRED STOCK.—

(1) AMOUNT OF CREDIT.—In the case of a public utility, (A) for a taxable year beginning on January 1, 1951, and ending on December 31, 1951, an amount equal to 28 per centum of the lesser of (i) the amount of dividends paid during the taxable year on its preferred stock or (ii) the adjusted net income for such taxable year minus the credit for dividends received provided in subsection (b) for such year, \* \* \* For the purposes of the credit provided in this subsection the amount of dividends paid shall not include any amount distributed in the current taxable year with respect to dividends unpaid and accumulated in any taxable year ending prior to October 1, 1942. \* \* \* The credit provided in this subsection shall be subtracted from the basic surtax credit provided in section 27.

(2) DEFINITIONS.—As used in this subsection, subsection (b), and sections 13 and 15—

(A) Public Utility.—The term "public utility" means a corporation engaged in the furnishing of telephone service or in the sale of electric energy, gas, or water, if the rates for such furnishing or sale, as the case may be, have been established or approved by a State or political subdivision thereof or by an agency or instrumentality of the United States or by a public utility or public service commission or other similar body of the District of Columbia or of any State or political subdivision thereof.

(B) Preferred Stock.—The term "preferred stock" means stock issued prior to October 1, 1942, which during the whole of the taxable year (or the part of the taxable year after its issue) was stock the dividends in respect of which were cumulative, limited to the same amount, and payable in preference to the payment of dividends on other stock. Stock issued on or after October 1, 1942, shall be deemed for the purposes of this paragraph to have been issued prior to October 1, 1942, if it was issued \* \* \* to refund or replace bonds or debentures issued prior to October 1, 1942, or to refund or replace other preferred stock.

shall not include a distribution for dividends unpaid and accumulated in any year ending prior to October 1, 1942.

On June 1, 1951, in the proceeding for reorganization of South Bay under chapter X of the Bankruptcy Act, the U.S. District Court ordered the trustee of South Bay to pay in full on or after June 8, 1951, the par value of all its preferred stock plus dividends unpaid and accumulated thereon to June 8, 1951. Thereafter, pursuant to such order and during its calendar taxable year 1951, South Bay distributed to its preferred shareholders the sum of $215.90 with respect to each outstanding share of its $100 par value preferred stock, that is, it redeemed each preferred share at par and paid $115.90 as accumulated dividends thereon. It is stipulated that of the total amount so paid to South Bay's preferred shareholders, $165,662.72 represents 28 percent of payments on account of dividends unpaid and accumulated in taxable years ending after October 1, 1942.

Such percentage and the years involved are part of the requirements in the computation of the amount of the dividends paid credit provided for by section 26(h)(1), *supra*, and, further, no issue is raised as to the correctness of the *amount* of the claimed credit, that is, that it is 28 percent of the lesser of (i) the dividends paid during the taxable year or (ii) the adjusted net income for such year minus credit for dividends received for such year, as provided in that subsection. There is no question herein but that the preferred stock involved was issued prior to October 1, 1942, and that the dividends thereon were cumulative, limited to the same amount, and payable in preference to dividends on other stock, as required by section 26(h)(2)(B), *supra*. Furthermore, under the facts herein, there is no question but that South Bay was an operating corporate "public utility" which was "engaged * * * in the sale of * * * water" as required by section 26(h)(2)(A), *supra*, over a long term of years prior and subsequent to October 1, 1942, and up to and including the first part of the calendar taxable year 1951, in which the unpaid accumulated dividends involved herein were paid.

South Bay's properties were condemned and taken over by the Suffolk County Water Authority as of May 31, 1951, for which an award was made in payment therefor, and on June 1, 1951, the district court ordered the redemption of South Bay's preferred stock at par and payment of the dividends accrued thereon up to June 8, 1951. While its water utility properties were liquidated and both its bonds and preferred stock were redeemed in 1951, South Bay remained in existence throughout the calendar year and its tax return for that year, filed as a public utility, reported income from operating revenue from sale of water, interest, and gain on involuntary conversion of its properties.

Petitioner South Bay contends that under the stipulated facts and the provisions of section 26(h), *supra*, it is clearly entitled to the claimed credit for dividends paid on its preferred stock during the calendar taxable year 1951.

Respondent makes a double-barreled contention that the claimed credit is not allowable. First, respondent contends that regardless of South Bay's identity as a public utility prior to the time all of its physical properties were condemned and taken over by the Water Authority as of May 31, 1951, thereafter South Bay failed to meet the specific definition of a "public utility" because it was not actually "engaged * * * in the sale of * * * water" as required by section 26(h)(2)(A), *supra*, *on the date of the distribution* made on or after June 8, 1951. Second, respondent states that the facts clearly show that no part of the distribution was attributable to the purported accumulated dividends on preferred stock within the meaning of section 26, *supra*, and that *the entire payment* made to preferred stockholders in 1951 was in redemption of stock on liquidation of South Bay. Based on such premise, respondent contends that section 115(c) of the Internal Revenue Code of 1939[5] is applicable and requires that the entire distribution on preferred shares "shall be treated as in full payment in exchange for the stock" as provided in that section.

The respondent's statement as to the factual circumstance in respect to the character of the total $215.90 payment per share on preferred stock, is contrary to the stipulated facts. Pursuant to the

---

[5] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(a) DEFINITION OF DIVIDEND.—The term "dividend" when used in this chapter * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year * * * without regard to the amount of the earnings and profits at the time the distribution was made.

* * * * * * *

(c) DISTRIBUTION IN LIQUIDATION.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. In the case of amounts distributed (whether before January 1, 1939, or on or after such date) in partial liquidation (other than a distribution to which the provisions of subsection (h) of this section are applicable) the part of such distribution which is properly chargeable to capital account shall not be considered a distribution of earnings or profits.

* * * * * * *

(g) REDEMPTION OF STOCK.—

(1) IN GENERAL.—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

* * * * * * *

(i) DEFINITION OF PARTIAL LIQUIDATION.—As used in this section the term "amounts distributed in partial liquidation" means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock.

District Court order of June 1, 1951, the preferred stock was in fact redeemed at its $100 par value (i.e., no premium was paid) and unpaid accumulated dividends of $115.90 per share were in fact paid. Undoubtedly the redemption payment of $100 per share was "in full payment in exchange for the stock" under section 115(c), *supra*, but respondent fails to cite section 115(g) of the 1939 Code [5] which provides that a stock redemption distribution which is "in whole or in part essentially equivalent to the distribution of a taxable dividend, * * *, shall be treated as a taxable dividend."

On the record herein we conclude and hold that the portion of South Bay's 1951 distribution on its preferred stock in excess of the $100 par value thereof, constituted "dividends paid during the taxable year" within the meaning of section 26(h)(1), *supra*. Cf. *Atlantic City Electric Co.* v. *United States*, 142 Ct. Cl. 519, 161 F. Supp. 811 (1958), certiorari denied 358 U.S. 834 (1958).

In the *Atlantic City Electric Co.* case the Court of Claims discussed at length the provisions of section 26(h) and 115(c), *supra*. With reference to the enactment of section 26(h) the court said it appears that, for tax purposes, Congress desired to give to public utility companies which had financed themselves by issuing preferred stock a status similar to that of such corporations which had financed themselves by issuing bonds, and since the interest on bonds was deductible the dividends on preferred stock were made deductible by way of a credit. In that case preferred stock issued by the taxpayer, a public utility, provided that the corporation at its option could redeem its $100 par value shares for $120 plus accrued dividends, and the corporation did so redeem them. The court stated that, "The accrued dividends so paid were clearly deductible under the provisions of section 26(h), and they are not involved in this case." The redemption payments of $20 per share in excess of par value were also claimed by the taxpayer as "dividends paid" for the purposes of section 26(h) credit, and the court held that they were not the payments of $6 per share which accrued annually on the preferred stock, but were a part of the redemption paid to liquidate the stock under the provisions of section 115(c).

Respondent cites no authority in support of his narrow interpretation of section 26(h), *supra*, to the effect that the claimed credit is not allowable to South Bay because its properties were condemned and taken over as of May 31, 1951, and it was no longer actually "engaged * * * in the sale of * * * water" *on the date of the subsequent distribution* in the taxable year pursuant to a court order of June 1, 1951. The statute itself is silent as to either the allowance or denial of the dividends paid credit under the factual situation here involved, and

---

[5] See footnote on preceding page.

so are Treasury Regulations 111, section 29.26-5,[6] applicable to the taxable year in question. Those regulations disclose a fair and reasonable interpretation of the statutory provision in several other respects, for instance, that the credit will not be denied solely because part of a corporation's gross income consists of revenue derived from sales at rates which are not regulated by a public authority, or denied in the case of a given class of preferred stock merely because another class of preferred stock has preference in the payment of dividends, and that it is immaterial whether the preferred stock be voting or nonvoting stock. In Rev. Rul. 228, 1953-2 C.B. 26, under Regulations 118, section 39.26(h), see footnote 6, it was ruled that the dividends paid credit would not be denied because a corporation was not solely a "public utility" as defined in section 26(h) of the 1939 Code, *supra*, in that it derived income from both utility and nonutility sources and, further, that since the statute is silent as to nonutility activities, the allowance of the credit under "an apportionment formula which allocates the dividends paid credit upon a basis of utility and nonutility income avoids extreme results and attains a reasonable and practical interpretation of section 26(h) of the Code."

In *Public Service Electric & Gas Co.* v. *United States*, 141 Ct. Cl. 404 (1958), 157 F. Supp. 846, the Court of Claims held that the taxpayer, a "public utility" corporation, was entitled to a dividends paid credit under section 26(h) of the 1939 Code, although the preferred stock with respect to which the credit was claimed was issued after October 1, 1942, in exchange for and to replace old preferred stock of its parent holding company, which was not a "public utility." The Commissioner argued that the preferred stock issued by the taxpayer did not qualify as a *replacement* under section 26(h)(2)(B) because the preferred stock of the parent did not qualify as preferred stock of a "public utility" with respect to which the credit was available. The portion of section 26(h)(2)(B) there involved does not specifically require that the preferred stock replaced shall itself qualify for the dividends paid credit. The court held that the allowance of the claimed credit was within the intent and purpose of the statute.

In the instant case South Bay was unquestionably operating as a "public utility" engaged in the sale of water, within the meaning of section 26(h), *supra*, over a long period of years up to and including the first part of the taxable year 1951 and the unpaid accumulated dividends paid during the taxable year related to such business. On

---

[6] Treasury Regulations 111 (applicable only to years beginning after Dec. 31, 1941) sec. 29.26-5, as originally promulgated and amended by T.D. 5384, June 30, 1944; by T.D. 5950, Dec. 2, 1952; and by T.D. 6195, Aug. 8, 1956. Treasury Regulations 118 (applicable only to years beginning after Dec. 31, 1951) sec. 39.26(h) has no provision covering this situation, nor for that matter does the Internal Revenue Code of 1954, sec. 247, providing for a deduction for dividends paid on certain preferred stock of public utilities, or Treasury Regulations, sec. 1.247-1, promulgated thereunder.

the record we conclude and find that the dividend payment involved herein falls within the intent and purpose of section 26(h), *supra*, and that petitioner South Bay is entitled to the claimed dividends paid credit under that section. On this issue we hold that respondent erred in his determination.

In our opinion the fifth and sixth issues herein involving petitioner New York are controlled by our holding with respect to the related third issue herein. We have held that the debt for accrued interest on the loan accounts and also the debt for the principal of the demand note and accrued interest thereon owed to New York by South Bay, were canceled by the latter's shareholder and thereby constituted contributions to the capital of South Bay. It follows that the accrued interest on the loan accounts (in the stipulated amount of $113,261.24 to April 27, 1949, or the larger amount of $113,329.57 as alleged by petitioner New York) did not become a worthless debt in 1951 and respondent's disallowance of the claimed bad debt deduction involved in the fifth issue herein is approved. Further, since New York's cancellation of the note and interest thereon as a contribution to South Bay's capital increased New York's capital investment in its shares of common stock of South Bay, it follows that New York did not thereby realize taxable income and with respect to the sixth issue herein we hold that respondent erred in including in petitioner New York's income for 1951 an additional amount of $500,213.77 as set forth in the statutory deficiency notice.

> *Decision in each docket number herein will be entered under Rule 50.*