AMERICAN WIRE FABRICS CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 25621.    Promulgated March 14, 1951.

*John W. Drye, Jr., Esq.*, and *John J. Costello, Esq.*, for the petitioner.

*John J. Madden, Esq.*, for the respondent.

**612**

HARRON, *Judge:* The primary issue in this proceeding is whether the basis to petitioner of the assets which it acquired from its predecessor corporation in 1922 is the cost of the properties to petitioner, or whether the basis of the assets to petitioner is the same as the basis of the assets in the hands of the transferor. The determination of the proper basis is necessary in order to compute the depreciation deductions, losses on sale and abandonment of property, and the excess profits credit based on equity invested capital to which petitioner was entitled for the years 1941 and 1942. The basis of the assets in question depends upon whether or not they were acquired by petitioner from its predecessor corporation as the result of a tax-free reorganization within the meaning of section 202 of the Revenue Act of 1921.[1] If, as petitioner contends, the assets were not acquired as the result of such a reorganization, the basis of the property to petitioner is the amount which petitioner paid for the assets. Section 113 (a) provides that the basis of property is the cost of such property unless one of the exceptions listed in the section applies. On the other hand, if respondent's contention is correct and the assets were acquired by petitioner as the result of a tax-free reorganization, the exceptions of either section 113 (a) (7) or section 113 (a) (12) [2] apply; and the basis of the assets to petitioner is the same as the basis of the assets in the hands of the transferor.

---

[1] SEC. 202. (a) That the basis for ascertaining the gain derived or loss sustained from a sale or other disposition of property, real, personal, or mixed, acquired after February 28, 1913, shall be the cost of such property :

\* \* \* \* \* \* \*

(c) For the purposes of this title, on an exchange of property, real, personal or mixed, for any other such property, no gain or loss shall be recognized unless the property received in exchange has a readily realizable market value ; but even if the property received in exchange has a readily realizable market value, no gain or loss shall be recognized—

\* \* \* \* \* \* \*

(2) When in the reorganization of one or more corporations a person receives in place of any stock or securities owned by him, stock or securities in a corporation a party to or resulting from such reorganization. The word "reorganization," as used in this paragraph, includes a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or of substantially all the properties of another corporation), recapitalization, or mere change in identity, form, or place of organization of a corporation, (however effected) ; or

(3) When (A) a person transfers any property, real, personal or mixed, to a corporation, and immediately after the transfer is in control of such corporation, or (B) two or more persons transfer any such property to a corporation, and immediately after the transfer are in control of such corporation, and the amounts of stock, securities, or both, received by such persons are in substantially the same proportion as their interests in the property before such transfer. For the purposes of this paragraph, a person is, or two or more persons are, "in control" of a corporation when owning at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

[2] SEC. 113.

\* \* \* \* \* \* \*

(7) TRANSFERS TO CORPORATION.—If the property was acquired—

(A) after December 31, 1917, and in a taxable year beginning before January 1, 1936, by a corporation in connection with a reorganization, and immediately after

The respondent bases his position on the contention that Wickwire first acquired ownership of the stock of the Company and that petitioner subsequently acquired ownership of the assets of the Company in an independent transaction as a result of which Wickwire received control of petitioner. He contends that Naphen & Co. was acting as the agent of Wickwire throughout the series of transactions and that the securing by Naphen & Co., as agent for Wickwire, of options to purchase the stock of the Company from its shareholders constituted ownership of the stock in Wickwire.

The petitioner contends, however, that the continuity of control necessary for a tax-free reorganization to have been effected is lacking. It contends that each of the transactions involved in this proceeding was merely a step in a series of integrated transactions which had as their purpose the ultimate transfer of control of the assets of the Company from the stockholders of the Company to Wickwire as sole stockholder of petitioner. We believe that petitioner's contention is correct and that the formation of petitioner and the acquisition by it of the assets of the Company were an essential step in an over-all plan, rather than an independent transaction which followed the securing by Wickwire of ownership of the stock of the Company. The test to be applied in order to determine whether a particular transaction is complete in itself or whether it is merely a step in a series of integrated transactions or, put another way, whether a series of steps should be treated as a single, indivisible transaction or should retain their separate entity is whether the various steps were "so interdependent that the legal relations created by one transaction would have been fruitless without the completion of the series." *American Bantam Car Co.*, 11 T. C. 397, aff'd., 177 Fed. (2d) 513. See also, *ACF-Brill Motors Co.*, 14 T. C. 263, *Independent Oil Co.*, 6 T. C. 194; *Spang, Chalfant & Co.*, 31 B. T. A. 721; Paul, Selected Studies in Federal Taxation, 2d Series, pp. 200-254. Applying this test to the facts before us, we are convinced that the various steps were part of an integrated transaction, rather than several independent transactions, and that the legal rights, powers, and duties resulting

the transfer an interest or control in such property of 50 per centum or more remained in the same persons or any of them,

\*          \*          \*          \*          \*

then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made. \* \* \*

\*          \*          \*          \*          \*

(12) BASIS ESTABLISHED BY REVENUE ACT OF 1932.—If the property was acquired, after February 28, 1913, in any taxable year beginning prior to January 1, 1934, and the basis thereof, for the purposes of the Revenue Act of 1932. 47 Stat. 199, was prescribed by section 113 (a) (6), (7), or (9) of such Act, then for the purposes of this chapter the basis shall be the same as the basis therein prescribed in the Revenue Act of 1932.

Section 113 (a) (7) of the Revenue Act of 1932 is substantially the same as section 113 (a) (7) of the Code.

from one of the transactions would have been ineffectual without the completion of the other mutually interdependent steps. So viewed, the stockholders of the Company were in control of the transferor corporation before the transaction and Wickwire was in control of the transferee corporation immediately thereafter. Since the original stockholders were various individuals who had no interest in Wickwire, the continuity of control required to constitute a transaction a tax-free reorganization was not present.

The intention of the parties was that petitioner should be incorporated to take over the assets and operations of the Company. This is evidenced by the contract between Naphen & Co. and Wickwire which provided for the organization of petitioner by Naphen & Co. and the subsequent acquisition by petitioner of the assets of the Company in exchange for an agreed-upon consideration. Naphen & Co. and Wickwire also agreed that the stock which petitioner was to transfer to Naphen & Co. was to be transferred by Naphen & Co. to Wickwire. These were all integrated steps designed to accomplish the ultimate result. Lacking any one of the steps, none of the others would have been made; the various steps were so interlocked and interdependent that a separation of them, as is suggested by respondent, would defeat the purpose of each and the expressed intention evidenced by the agreement between Wickwire and Naphen & Co.

Even if we agreed with respondent that Naphen & Co. was merely acting as Wickwire's agent throughout the transactions and that the acquisition by Naphen & Co. of the options to purchase the Company's stock was equivalent to the acquisition of such options by Wickwire, we can not take the further step requested by respondent and conclude that the acquisition of options to purchase stock is equivalent to ownership of the stock optioned. Manifestly, actual exercise of the options and purchase of the stock is necessary to obtain ownership. This essential step was not taken until after the formation of petitioner, and, concurrently with it, petitioner acquired ownership of the assets from the Company by delivering $1,350,000 plus 20,000 shares of its stock to Naphen & Co., after which Naphen & Co. paid $3,150,000 to the stockholders of the Company for their shares pursuant to the option agreements. The consideration for the assets was paid by petitioner to Naphen & Co. pursuant to the contract entered into between petitioner and the Company in order to facilitate the payments by Naphen & Co. to the stockholders of the Company for their stock. Whether the options were obtained and exercised by Naphen & Co. as Wickwire's agent or for its own account, no means of exercising the options were provided until the basic agreement with Wickwire was executed on August 24, 1922. As a result of this agreement the obligation of Wickwire to conclude the transactions became certain and the formation of petitioner was as-

sured. And only after the organization of petitioner was it possible for Naphen & Co. to acquire the necessary funds with which to exercise the options previously obtained, either for itself or as Wickwire's agent. A unified plan was thus perfected under which Wickwire acquired control of the transferred assets when that control was relinquished by the stockholders of the Company. That ultimate point was reached when Wickwire paid Naphen & Co. for the 20,000 shares of stock of petitioner. Before that time, the stockholders of the Company were in control of its assets. After the completion of the interdependent, correlated transactions, Wickwire, which had no relation to the stockholders of the Company, was in control of the transferred assets. The continuity of control necessary to effect a tax-free reorganization, therefore, was lacking. See *Schumacher Wall Board Corporation*, 33 B. T. A. 1211, affd., 93 Fed. (2d) 79.

It is held that the assets which petitioner acquired in 1922 from its predecessor corporation were not acquired as the result of a tax-free reorganization. The exceptions to a cost basis found in sections 113 (a) (7) and 113 (a) (12), therefore, do not apply, and the basis to petitioner of the properties so acquired is the amount which petitioner paid for the assets.

There remains the question of the cost to petitioner of the assets which it acquired from its predecessor corporation. Both parties agree that petitioner paid $1,350,000 in cash, assumed $228,887.47 in liabilities, and transferred 20,000 shares of its stock in exchange for the assets. The only dispute between the parties relates to the fair market value of the 20,000 shares of stock transferred.

Respondent contends that the fair market value of the stock transferred was only $1,800,000. He arrives at this figure by assuming that the fair market value of the Company in 1922 was the amount which Naphen & Co. paid to the individual holders of the 15,000 shares of stock of the Company, or $3,150,000. From this amount of $3,150,-000 respondent has deducted the $1,350,000 in cash paid by petitioner, leaving the difference of $1,800,000 to represent the fair market value of petitioner's stock. We do not believe, however, that the fair market value of petitioner's stock can be computed in this way. The error in such method of computation is that it is based on a valuation of the Company's stock to the holders thereof rather than on a valuation of petitioner's stock. There is not sufficient relationship between the two to justify such a procedure. We are not concerned with the determination of the amount received by the Company's stockholders from the sale of their shares of stock, but rather with the fair market value of petitioner's stock. The best evidence of such value is the price actually paid for the shares in question in an arm's length transaction between Wickwire and Naphen & Co. In a similar situation in *Com-*

*missioner* v. *Schumacher Wall Board Corporation*, *supra*, the court said:

The Commissioner is in error. The cost of an article to a person is what the person pays for the same. The Commissioner asserts that if all these sales and transfers were part and parcel of the same general transaction, then whatever the Schumacher individuals, stockholders of the old corporation, received for the assets should be the cost of the assets to the new corporation. The argument is specious. Whether there was one transaction or many, the new corporation taxpayer paid a definite amount for its assets. The amount it paid is obviously the cost to it of those assets. The fact that some of the quid pro quo went to promoter Hunter, Dulin & Co., instead of to the former owners of the assets, has nothing to do with what the assets cost the taxpayer. (93 Fed. (2d) at 82.)

See, also, *Hazeltine Corporation*, 32 B. T. A. 110, affd. on this point, 89 Fed. (2d) 513.

The difference between the value contended for by petitioner and that contended for by respondent represents that portion of the purchase price of the stock which was retained by the promoter, Naphen & Co., as a legitimate profit for its part in the series of transactions, including the assembling of 100 per cent ownership in the Company. The fact that this amount was retained by Naphen & Co. rather than paid to the various holders of small lots of the Company's stock does not decrease the fair market value of petitioner's stock. It is held that the fair market value of the 20,000 shares of petitioner's stock was the purchase price paid by Wickwire to Naphen & Co., or $2,375,000, and that the total cost of the assets acquired by petitioner from the Company was $3,953,887.47.

A check on this valuation is available from a consideration of the various integrated steps in the transaction by which Wickwire acquired 100 per cent ownership of petitioner, which had acquired complete ownership of the assets in question. The net result of the interdependent steps was that Wickwire and petitioner, its wholly-owned subsidiary, together paid out cash in the amount of $2,127,500, transferred notes which had a fair market value of $1,597,500, and assumed liabilities in the amount of $228,887.47. In exchange for these items which totaled $3,953,887.47, the assets in question were received.

*Decision will be entered under Rule 50.*