Yoc Heating Corp. (formerly known as Nassau Utilities Fuel Corp.), Petitioner *v.* Commissioner of Internal Revenue, Respondent

Docket Nos. 625–69, 5680–71.   Filed November 7, 1973.

---

*Allan Bakst* and *Henry L. Glenn*, for the petitioner.
*Michael A. Menillo* and *Alfred C. Bishop, Jr.*, for the respondent.

TANNENWALD, *Judge:* Respondent determined the following deficiencies in petitioner's income tax:

| Docket No. | Year | Deficiency |
|---|---|---|
| 625–69 | 1963 | $34, 432. 35 |
| | 1964 | 27, 767. 95 |
| | 1965 | 51, 224. 41 |
| 5680–71 | 1966 | 75, 530. 40 |
| | 1967 | 33, 333. 28 |

Because of concessions made by the parties, the issues that remain to be decided are:

(1) Whether the basis of the assets that petitioner acquired from another corporation in 1962 is their cost to petitioner, or whether it is the same basis as those assets had in the hands of the other corporation;[1]

(2) Whether a net operating loss incurred by petitioner after it acquired those assets must first be carried back to prior taxable years of that other corporation before it may be carried over to petitioner's subsequent taxable years.

The resolution of these issues will depend upon the characterization of the transaction whereby petitioner acquired all of the assets of that other corporation.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioner is a corporation whose principal office was in Massapequa, N.Y., at the time it filed its petitions in this case. It filed its Federal income tax returns for 1963 through 1967 with the district director of internal revenue, Brooklyn, New York. When the events involved

---

[1] The basis of those assets will determine the amount of depreciation petitioner may deduct for the taxable years in issue and the amount of gain it must recognize on the sale of certain of those assets in 1965.

in this case took place, petitioner's name was Nassau Utilities Fuel Corp.[2] Petitioner will hereafter sometimes be referred to as New Nassau, to distinguish it from the corporation mentioned in the next paragraph.

Nassau Utilities Fuel Corp., which will be referred to as Old Nassau, was a corporation organized in 1929 under the laws of the State of New York and had its principal place of business in Roslyn, N.Y. Old Nassau was engaged in the business of selling fuel oil at both wholesale and retail. It conducted this business using water terminal facilities and storage tanks on property it owned and leased on the north shore of Long Island, New York (hereinafter referred to as the Roslyn terminal).

Reliance Fuel Oil Corp. (Reliance) is a corporation organized under the laws of the State of New York with its principal place of business in Massapequa, N.Y. It was engaged in the business of selling fuel oil at retail from an inland terminal. Because it lacked a water terminal and adequate storage tanks, it was compelled to buy oil from a wholesaler at prices higher than it would have had to pay if it had had a water terminal with storage facilities which would have enabled it to buy greater amounts of oil direct from the major oil companies. Reliance's lack of water terminal and storage facilities also resulted in its being unable to exchange oil with other retailers on Long Island in the course of making deliveries to customers located in different parts of the Island and to accomplish deliveries only at an increased cost through the use of trucks.

As its sales increased, it became increasingly apparent to Reliance that it would have to acquire a water terminal somewhere on Long Island in order to maintain or improve the profitability of its business. Reliance had been seeking to purchase such a water terminal for a number of years.

In 1961, Reliance contacted Old Nassau to ascertain whether the Roslyn terminal might be purchased. Reliance was not interested in acquiring the business of Old Nassau, which it did not consider sufficiently profitable, but only the assets of Old Nassau, particularly the Roslyn terminal. By August of that year, Reliance and Old Nassau had formulated the draft of an agreement for the sale to Reliance for cash and notes of all of Old Nassau's assets, which were to be transferred to a new corporation organized and owned by Reliance.

Before this proposed agreement for the sale of assets could be executed, however, Old Nassau informed Reliance that it would be unable to sell its assets because of opposition expected from its minority share-

---

[2] On Oct. 8, 1969, petitioner changed its name from Nassau Utilities Fuel Corp. to Yoc Heating Corp.

holders. Instead, a group of Old Nassau's controlling shareholders (hereinafter referred to collectively as the sellers), who together owned 84.8 percent of the corporation's common stock, offered to sell their stock to Reliance.[3]

Reliance consulted its attorney and accountant regarding this offer. Reliance was willing to purchase the stock only if the assets of Old Nassau could be transferred thereafter to a new corporation and take a stepped-up basis equal to the cost of the stock purchased. Reliance did not want to integrate the less profitable business of Old Nassau with its own business. Reliance's attorney and accountant advised that these objectives could be achieved through the proposed purchase of the stock of Old Nassau rather than the direct purchase of Old Nassau's assets, as originally intended.

On September 14, 1961, Reliance purchased for cash and its notes 7,825 shares, or 84.8 percent, of the common stock of Old Nassau. The notes were due in 28 quarterly installments and were secured by a pledge of the purchased stock to the sellers. The agreement between Reliance and the sellers allowed Reliance to vote the pledged stock so long as the notes were not in default. The agreement further provided that—

Reliance may vote to liquidate and dissolve [Old] Nassau only on condition that:

(a) All of the assets, except such sums of money required to purchase the interest of the minority stockholders in and to the stock held by them in [Old] Nassau, shall forthwith be transferred to a newly formed corporation (hereinafter called "CORPORATION"), all of whose issued and authorized shares of capital stock shall be issued and registered in Reliance.

(b) All of such shares of stock in the Corporation shall forthwith be pledged with [the sellers] in lieu and in place of the stock of [Old] Nassau pledged hereunder as though the stock of the Corporation was originally pledged and the said shares of stock in the Corporation shall be subject to each and every provision of this agreement.

Reliance then proceeded to follow the steps advised by its attorney and accountant to buy out the minority shareholders of Old Nassau and obtain a stepped-up basis for Old Nassau's assets in the hands of a new corporation. First, Reliance attempted to contact all the other shareholders of Old Nassau and purchase their stock for cash. By May of 1962, however, Reliance had succeeded by this effort in purchasing only a small number of additional shares of Old Nassau's stock.

---

[3] The members of the selling group were unrelated to Reliance or its shareholders. Old Nassau had issued and outstanding 9,227 shares of common stock. There is some indication in the record that Old Nassau also had 47 shares of preferred stock outstanding, although the purchase agreement pursuant to which Reliance purchased 84.8 percent of the common stock recited that Old Nassau's authorized and issued capital stock consisted of 9,227 shares of no-par common and the balance sheet on Old Nassau's final return for the period Jan. 1, 1962, to June 30, 1962 (and the notice of complete liquidation— Form 966—filed with the district director on or about July 23, 1962), did not indicate that any preferred stock was issued and outstanding.

On May 31, 1962, Reliance addressed to all the shareholders of Old Nassau an offer to purchase all of Old Nassau's assets. The terms of the offer were as follows:

(1) Old Nassau would change its name so as to make it available to a new corporation.

(2) Reliance would then organize a new corporation under the laws of the State of New York bearing the name Nassau Utilities Fuel Corp. (New Nassau).

(3) Old Nassau would then sell, assign, and transfer all its assets to New Nassau subject to all the liabilities of Old Nassau, which New Nassau would assume. In consideration therefor, New Nassau would, at the option of each shareholder of Old Nassau, either pay $40 for each share of Old Nassau common stock or exchange 1 share of New Nassau common for every 3 shares of Old Nassau common.

On June 1, 1962, a special meeting of the board of directors of Old Nassau was held to consider the above offer. The board resolved that the offer be accepted, that the corporation adopt a new name in place of the name Nassau Utilities Fuel Corp., that the assets subject to the liabilities of the corporation be sold and transferred to Reliance,[4] and that Old Nassau be dissolved.

On June 22, 1962, a special meeting of the shareholders of Old Nassau was held. The holders of 7,884 shares of common stock voted to approve the board's resolutions. The holders of 424 shares voted against the resolutions and thereafter commenced an action against Old Nassau in the appropriate State court for the appraisal and payment of the fair market value of their shares.

On July 3, 1962, Old Nassau adopted a new name in place of the name Nassau Utilities Fuel Corp., a new corporation (New Nassau) bearing the name Nassau Utilities Fuel Corp. was organized under the laws of the State of New York, and Old Nassau sold and transferred all its assets subject to its liabilities to New Nassau. On July 23, 1962, Old Nassau notified the Internal Revenue Service of its plan of dissolution. Old Nassau was dissolved on November 8, 1962.

In consideration for the assets of Old Nassau, and pursuant to the agreement of sale, New Nassau exchanged 1 share of its common stock for every 3 shares of Old Nassau common held by Reliance. No shareholders of Old Nassau other than Reliance accepted the offer to exchange stock of Old Nassau for stock of New Nassau, and no stock of New Nassau was issued to anyone other than Reliance.

Between September 14, 1961, and July 3, 1962, Reliance purchased for cash from the other shareholders of Old Nassau 411.75 shares of

---

[4] The resolution stated that all the assets of Old Nassau were to be "sold and transferred to Reliance," while Reliance's offer of May 31, 1962, spoke of a sale of all the assets of Old Nassau to the new corporation (New Nassau).

Old Nassau common. From July 3, 1962 to 1966, New Nassau made cash payments in varying amounts to the holders of 739 additional shares of Old Nassau common stock.[5] These payments were apparently made as a result of litigation instituted by some of the minority shareholders to enforce their right to claim payment other than in accordance with the agreement between Old Nassau and New Nassau.[6]

After its organization and the acquisition of all the assets of Old Nassau, New Nassau carried on business at the same location and with the same employees as those of Old Nassau. It engaged in the business of selling fuel oil to retail customers, as Old Nassau had done in the past, but did not make wholesale sales to distributors, as Old Nassau had previously done. New Nassau also leased certain facilities at the Roslyn terminal to Reliance, and it bought all its supplies of oil from Reliance.

During its first 6 months of operation, New Nassau incurred a net operating loss, as was reflected in the Federal income tax return it filed for the period July 1, 1962, to December 31, 1962.

Reliance's purpose in purchasing the stock of Old Nassau was to acquire the underlying assets of that corporation through the vehicle of New Nassau. The organization of New Nassau, the transfer of all the assets of Old Nassau to New Nassau, and the accompanying transfer to Reliance of the stock of New Nassau in exchange for the stock of Old Nassau and the payments by New Nassau to minority shareholders of Old Nassau were each steps in a single plan to accomplish that purpose.

#### OPINION

The resolution of the issues presented in this case will depend upon the proper characterization of the following transactions:

(1) The purchase by Reliance from unrelated sellers of more than 85 percent of the common stock of Old Nassau.

(2) The organization of New Nassau.

(3) The transfer to New Nassau by Old Nassau of all its assets and the assumption by New Nassau of all of Old Nassau's liabilities against the issuance of common stock of New Nassau or the payment of cash to the shareholders of Old Nassau.

The first question raised by this series of transactions is the basis to New Nassau of the assets it acquired from Old Nassau. Respondent

---

[5] There is some indication that New Nassau also made cash payments to the holders of 20 shares of Old Nassau preferred stock. See fn. 3 *supra*.

[6] The record does not disclose whether the holders of 251.25 shares of Old Nassau common who received neither stock nor cash payments from New Nassau ever asserted a claim against New Nassau in respect of their Old Nassau stock. The same is true with respect to the holders of 27 shares of Old Nassau preferred stock, if in fact any such stock was issued and outstanding. See fns. 3 and 5 *supra*.

contends that the transaction whereby New Nassau acquired all the assets of Old Nassau constituted a reorganization within the meaning of section 368(a)(1)(F) or, alternatively, section 368(a)(1)(D).[7] The acquired assets would then retain the same basis in the hands of New Nassau as they had in the hands of Old Nassau. Sec. 362(b). Petitioner (New Nassau) claims a higher basis in those assets equal to the cost of the Old Nassau stock purchased during the series of transactions summarized above, either under section 334(b)(2),[8] the *Kim-*

---

[7] Unless otherwise indicated, statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.

(a) REORGANIZATION.—

(1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—

\* \* \* \* \* \* \*

(D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356;

\* \* \* \* \* \* \*

(F) a mere change in identity, form, or place of organization, however effected.

[8] SEC. 334. BASIS OF PROPERTY RECEIVED IN LIQUIDATIONS.

(b) LIQUIDATION OF SUBSIDIARY.—

(1) IN GENERAL.—If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), then, except as provided in paragraph (2), the basis of the property in the hands of the distributee shall be the same as it would be in the hands of the transferor. If property is received by a corporation in a transfer to which section 332(c) applies, and if paragraph (2) of this subsection does not apply, then the basis of the property in the hands of the transferee shall be the same as it would be in the hands of the transferor.

(2) EXCEPTION.—If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), and if—

(A) the distribution is pursuant to a plan of liquidation adopted—

(i) on or after June 22, 1954, and

(ii) not more than 2 years after the date of the transaction described in subparagraph (B) (or, in the case of a series of transactions, the date of the last such transaction); and

(B) stock of the distributing corporation possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote, and at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends), was acquired by the distributee by purchase (as defined in paragraph (3)) during a 12-month period beginning with the earlier of—

(i) the date of the first acquisition by purchase of such stock, or

(ii) if any of such stock was acquired in an acquisition which is a purchase within the meaning of the second sentence of paragraph (3), the date on which the distributee is first considered under section 318(a) as owning stock owned by the corporation from which such acquisition was made,

then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made. For purposes of the preceding sentence, under regulations prescribed by the Secretary or his delegate, proper adjustment in the adjusted basis of any stock shall be made for any distribution made to the distributee with respect to such stock before the adoption of the plan of liquidation, for any money received, for any liabilities assumed or subject to which the

*bell-Diamond* doctrine,[9] or the broader principle sometimes referred to as the "integrated transaction" doctrine.[10]

The second issue in dispute is whether the net operating loss that New Nassau incurred during its first 6 months of operations ending December 31, 1962, must first be carried back to Old Nassau's taxable years 1959, 1960, and 1961 (in which event it would be used up) before being carried over to New Nassau's taxable years 1963 and 1964. The carryback will be required only if respondent is sustained in his contention that Old Nassau and New Nassau were parties to an (F) reorganization. Sec. 381(b)(3).

We deal first with petitioner's argument that it is entitled under section 334(b)(2) to a cost-of-stock basis in the assets it acquired from Old Nassau.

Section 334(b)(2) is applicable only to liquidations within the meaning of section 332(b). *Madison Square Garden Corp.*, 58 T.C. 619, 626 (1972), on appeal (C.A. 2, Aug. 6, 1973). Petitioner recognizes that the transaction whereby New Nassau acquired all the assets of Old Nassau does not fit within the precise terms of section 332(b). New Nassau did not satisfy the stock ownership requirement of section 332(b) and therefore could not be a "distributee" within the meaning of section 334(b)(2). See sec. 334(b)(4); MacLean, "Creeping Acquisitions," 21 Tax L. Rev. 345, 381 fn. 96 (1966). But petitioner asks us to disregard the form of the transaction as it occurred and focus only on the end result that was achieved. Petitioner suggests that the basis of Old Nassau's assets could have been stepped up in a section 334(b)(2) liquidation of Old Nassau into Reliance and that such basis could have been carried over to New Nassau by an immediate conveyance of those assets from Reliance to New Nassau by way of a section 351 transfer. Petitioner concludes that the transaction herein was the same in substance and likewise should afford New Nassau a stepped-up basis under section 334(b)(2) in the assets it acquired from Old Nassau.

Insofar as section 334(b)(2) is concerned, we are unwilling to ignore the form of the transaction deliberately chosen by the participants in preference to the above form suggested by petitioner or other possible forms that come to mind. It appears that the transaction between Old Nassau and New Nassau took the form it did in order to avoid any distributions in liquidation to the minority shareholders of Old Nassau

property was received, and for other items.

\*     \*     \*     \*     \*     \*     \*

(4) DISTRIBUTEE DEFINED.—For purposes of this subsection, the term "distributee" means only the corporation which meets the 80 percent stock ownership requirements specified in section 332(b).

[9] The doctrine takes its name from a leading case on the subject—*Kimbell-Diamond Milling Co.*, 14 T.C. 74 (1950), affirmed per curiam 187 F. 2d 718 (C.A. 5, 1951).

[10] See Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders 14-101—14-103 (3d ed. 1971).

and, perhaps, circumvent their potential rights of appraisal.[11] Section 332(b), the statutory threshold to section 334(b)(2), has been construed to require strict compliance with its formal requirements. *Estate of E. Brooks Glass, Jr.*, 55 T.C. 543, 569 (1970), affirmed on the Tax Court's opinion 453 F. 2d 1375 (C.A. 5, 1972). Cf. *Granite Trust Co.* v. *United States*, 238 F. 2d 670, 675–677 (C.A. 1, 1956) ; *Commissioner* v. *Day & Zimmermann*, 151 F. 2d 517 (C.A. 3, 1945), affirming a Memorandum Opinion of this Court; *Avco Manufacturing Corporation*, 25 T.C. 975, 979–981 (1956). Under the circumstances of this case, we see no reason why we should adopt a different approach.[12] Conceivably, there may be situations where a mechanistic interpretation of section 334(b)(2) may not be in order, but such a situation is not before us, and we express no opinion with respect thereto. See MacLean, *supra* at 381–382; Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders 11–44—11–45 (3d ed. 1971).

The same reason which precludes a step up in basis under section 334(b)(2) operates to bar the applicability of a carryover of basis under section 334(b)(1).[13] The definition of a "distributee" contained in section 334(b)(4) also applies to section 334(b)(1) and New Nassau did not fit within that definition. See p. 175 *supra*. The simple fact is that Old Nassau was not a subsidiary of New Nassau and consequently neither section 334(b)(1) or (2) has any bearing on the situation involved herein. Indeed, it is this reasoning which in all probability dictated respondent's exclusive reliance on the assertion that we should consider the transaction between Old Nassau and New Nassau as a reorganization under section 368(a)(1)(D) or (F). It is that assertion to which we now direct our attention, leaving to subsequent consideration petitioner's argument that the *Kimbell-Diamond* doctrine dictates a decision in its favor.

For the purpose of determining petitioner's basis in the assets acquired from Old Nassau, it is immaterial whether the transaction herein qualifies as a reorganization under clause (D) or clause (F) of section 368(a)(1). We turn first to a consideration of clause (D), which requires that after the consummation of that type of reorganization the transferor or one or more of its shareholders be "in control of" the transferee in accordance with the provisions of section 368(c).[14]

---

[11] See N.Y. Bus. Corp. Law secs. 909, 910 (McKinney 1963).

[12] We also note that if there was preferred stock of Old Nassau issued and outstanding, the requirements of secs. 332(b)(1) and 334(b)(2)(B) were not met. However, neither party has raised this possible defect with respect to the applicability of sec. 334(b)(2).

[13] See fn. 8 *supra*.

[14] SEC. 368(c) CONTROL.—For purposes of part I (other than section 304), part II, and this part, the term "control" means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation.

The determination of whether the requisite control existed herein depends upon a decision as to the proper points in time for making the determination. If we join with respondent and narrowly focus on the transaction that occurred between Old Nassau and New Nassau on July 3, 1962, that control existed by virtue of Reliance's ownership of more than 80 percent of the stock of both corporations and it would follow that a (D) reorganization occurred.[15] If, instead, we follow petitioner's lead and broaden our ken to include the earlier purchase by Reliance from unrelated persons of 84.8 percent of Old Nassau common stock, it is clear that there has been a substantial shift in ownership interest precluding the finding of the requisite control.

Our path to decision is framed within two cardinal principles, which apply in the reorganization area and which are so well established as not to require supporting citations. First, the fact that the form of the transaction conforms to the literal wording of the definition of a reorganization is not controlling. Second, when a transaction is composed of a series of interdependent steps, each undertaken to achieve an overall objective, the various steps should be viewed in their entirety for the purpose of determining its tax consequences—the so-called "integrated transaction" doctrine. The record herein clearly reveals that each step that was taken by Reliance and New Nassau was an integral part of a plan whereby the assets of Old Nassau would be acquired by a new corporation in which Reliance would control more than 80 percent of the issued and outstanding stock and the shareholders of Old Nassau would at most have no more than approximately a 15-percent interest in such stock. The agreement between Reliance and the sellers specifically envisaged the formation of New Nassau—a fact which distinguishes the instant situation from that involved in *Griswold* v. *Commissioner*, 400 F. 2d 427 (C.A. 5, 1968), affirming 45 T.C. 463 (1966). The fact that for valid business reasons there was a delay of several months before New Nassau came into existence and completed the acquisition does not militate against such conclusion. *H. B. Snively*, 19 T.C. 850, 860 (1953), affd. 219 F. 2d 266 (C.A. 5, 1955).

In view of the foregoing, we hold that a comparison of the stock ownership of Old Nassau immediately prior to the inception of the series of transactions involved herein with the situation which obtained immediately after the transfer by Old Nassau of its assets and liabilities to New Nassau clearly reveals that the control requirements of a (D) reorganization were not satisfied. See and contrast *Frederick*

---

[15] In their discussions of sec. 334(b)(2) and the reorganization provisions, both parties have ignored any preferred stock that Old Nassau may have had outstanding. We will do likewise, since it will not change the result we reach. See fns. 3, 5, and 6 *supra*.

*Steel Co.*, 42 T.C. 13, 24 (1964), reversed on another issue 375 F. 2d 351 (C.A. 6, 1967).

By a parity of reasoning rooted in the judicial "continuity of interest" principle applicable to reorganizations rather than in the specific statutory definition of "control" contained in section 368(c), there was likewise no (F) reorganization. *Helvering* v. *Southwest Corp.*, 315 U.S. 194 (1942); *Hyman H. Berghash*, 43 T.C. 743 (1965), affd. 361 F. 2d 257 (C.A. 2, 1966). Compare *May B. Kass*, 60 T.C. 218 (1973), on appeal (C.A. 3, July 16, 1973). Compare also *Casco Products Corp.*, 49 T.C. 32 (1967), where the intention was from the outset to acquire stock and not assets.

Since there was no (D) or (F) reorganization, there can be no carryover of Old Nassau's basis under section 362(b). Likewise, in the absence of an (F) reorganization, the carryback of petitioner's net operating loss to the prior taxable years of Old Nassau is not permitted. Sec. 381(b)(3).

Having concluded that the assets and liabilities of Old Nassau were acquired by New Nassau other than by way of a reorganization or a liquidation of Old Nassau, it remains for us to determine how that acquisition should be characterized. Under all the circumstances, we conclude that such acquisition was by way of purchase with an accompanying step up in basis to petitioner and we so hold. We posit our holding on the "integrated transaction" doctrine in terms of the application of that principle generally and not in terms of the narrower *Kimbell-Diamond* doctrine. In the first place, we note that the *Kimbell-Diamond* doctrine has been limited in the past to situations where the corporation acquiring the assets was the principal shareholder of the corporation transferring the assets, a factual pattern which is not present herein. Moreover, in the general area with which we are dealing in this case, the *Kimbell-Diamond* doctrine has usually been the touchstone for decision but it has not been accorded a preclusive quality. Courts have seen fit to apply the broader integrated transaction principle rather than to rely on the *Kimbell-Diamond* doctrine. E.g., *Long Island Water Corporation*, 36 T.C. 377 (1961); *Southwell Combing Co.*, 30 T.C. 487 (1958); *American Wire Fabrics Corporation*, 16 T.C. 607 (1951). Consequently, we find no need to examine the question argued by the parties as to whether the *Kimbell-Diamond* doctrine per se has a current vitality.[16]

---

[16] See *American Potash & Chemical Corporation* v. *United States*, 399 F. 2d 194, 207–209 (Ct. Cl. 1968), where the Court of Claims held that the doctrine did have such vitality, and 402 F. 2d 1000, 1001 fn. 2 (Ct. Cl. 1968), where on rehearing the Court of Claims stated that the Government "no longer argues that the *Kimbell-Diamond* approach is not viable." See also *Pacific Transport Co.* v. *Commissioner*, 483 F. 2d 209 (C.A. 9, 1973), vacating and remanding a Memorandum Opinion of this Court.

We are left with a final question, namely, the method by which petitioner's total basis in the assets should be calculated and allocated. Due to various difficulties with the record in its present form, we have decided to leave the ultimate resolution of this question to the Rule 50 computation.

Clearly, the total basis should include the amounts paid by Reliance both for the shares of Old Nassau, which were the subject of the initial acquisition, and for additional shares of Old Nassau acquired by Reliance prior to the formation of petitioner and the acquisition by petitioner of the assets and liabilities of Old Nassau. Similarly, the liabilities of Old Nassau assumed by petitioner as part of that acquisition should be included. *Montana-Dakota Utilities Co.*, 25 T.C. 408, 415 (1955); *American Wire Fabrics Corporation, supra; Illinois Water Service Co.*, 2 T.C. 1200, 1236 (1943). With respect to the shares of common stock of Old Nassau acquired by New Nassau for cash after the transfer of Old Nassau's assets, the situation is less clear. Under the agreement of sale, New Nassau was required to pay minority shareholders either $40 a share or stock; in point of fact, it paid cash in all such cases and in amounts considerably in excess of $40 a share. To the extent that such payments were made in satisfaction of the rights of the minority shareholders to the fair value of their interest in the assets of Old Nassau, the amounts paid will be a proper addition to the total basis of the assets. See *May B. Kass, supra*, and particularly fn. 13; Rev. Rul. 59–412, 1959–2 C.B. 108.[17] However, we are constrained to indicate that, on the basis of the present record, the likelihood that New Nassau would be required to purchase such interests and the measure of that obligation were so contingent and indefinite as of the date of the transfer of assets by Old Nassau that, to the extent that any of such payments should properly be included in the total basis of the assets, such inclusion should not be made until the year of payment. Cf. *Columbus & Greenville Railway Co.*, 42 T.C. 834 (1964), affirmed per curiam 358 F. 2d 294 (C.A. 5, 1966); *Albany Car Wheel Co.*, 40 T.C. 831 (1963), affirmed per curiam 333 F. 2d 653 (C.A. 2, 1964). *Pacific Transport Co.* v. *Commissioner*, fn. 16 *supra*, involved the question whether a particular payment was deductible or required to be capitalized and is clearly distinguishable. The same reasoning should preclude the inclusion in petitioner's basis of the amounts it

---

[17] We do not read *Madison Square Garden Corp.*, 58 T.C. 619, 627 (1972), on appeal (C.A. 2, Aug. 6, 1973), as requiring a different conclusion. That case turned on the state of the pleadings and the evidence. See *Mary B. Kass*, 60 T.C. 218, 223–225 (1973).

paid for the minority shares of Old Nassau which were not acquired prior to the end of the last taxable year involved herein.[18]

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

RAUM, *J.*, concurs in the result only.

___

SCOTT, *J.*, dissenting: I respectfully disagree with the holding of the majority in this case as to the basis of the assets acquired by New Nassau. As I understand the majority holding, the basis of these assets is not being determined under either the provisions of section 334(b) (2) or the doctrine of *Kimbell-Diamond Milling Co.*, 14 T.C. 74 (1950), affirmed per curiam 187 F. 2d 718 (C.A. 5, 1951). Therefore, under the provisions of section 1012 of the Code, the basis of the assets "shall be the cost" of such assets, and under section 1.1012–1(a), Income Tax Regs., "the cost is the amount paid for such property in cash or other property." Here, the assets of Old Nassau were paid for by New Nassau with stock and assumption of liability.

We have long recognized that where assets are exchanged for stock in a taxable transaction, the cost of the assets is the fair market value of the stock issued therefor, and if the fair market value of the stock cannot be otherwise ascertained and all or substantially all of the corporate stock is issued for the assets, the value of the stock is to be measured by the fair market value of the property received in exchange for the stock. *MacCallum Gauge Co.*, 32 B.T.A. 544, 549 (1935). Of course, if liabilities are assumed as part of the property paid for the assets acquired, the amount of the liabilities assumed is added to the fair market value of the stock. *Kalmon Shoe Manufacturing Co.* v. *Commissioner*, 321 F. 2d 189 (C.A. 8, 1963), affirming a Memorandum Opinion of this Court.

Here the facts show that Reliance acquired approximately 85 percent of the Old Nassau stock on September 14, 1961, nearly 9 months prior to the date of the sale of the assets of Old Nassau to New Nassau. It is, in my view, incorrect to hold, as the majority in effect does, that the amount paid by Reliance for the shares of Old Nassau represents the fair market value 9 months later of the stock of New Nassau exchanged for the stock of Old Nassau in consideration for the assets of Old Nassau.

The cases relied upon by the majority do not support the proposition that the cost, as distinguished from the fair market value at the date of the exchange, of stock exchanged for assets is determinative

___

[18] On the present record, we are unable to determine whether the payment made by New Nassau allegedly for 20 shares of preferred stock of Old Nassau should be included in petitioner's total basis. See fns. 3 and 5 *supra*.

of the basis of those assets. In *Montana-Dakota Utilities Co.*, 25 T.C. 408, 415 (1955), the transaction was held to constitute a purchase by the taxpayer of the properties of another company under the holding of *Kimbell-Diamond Milling Co., supra.*

The stock of the old company was purchased by the taxpayer the same day that the old company was dissolved. On this basis we held that the cost of the property acquired was the amount paid for the stock. In *Illinois Water Service Co.*, 2 T.C. 1200 (1943), we specifically held that the basis of the properties acquired was the fair market value of the securities exchanged therefor and further held under the facts in that case that the fair market value of the stock was the same as the amount paid for the stock. In *American Wire Fabrics Corporation*, 16 T.C. 607, 615 (1951), we specifically held that the cost of the assets acquired by the taxpayer was the fair market value of the stock exchanged for those assets.

As we pointed out in *Montana-Dakota Utilities Co., supra*, in a closed transaction the "cost of property includes * * * the liabilities to which the property is subject or which are assumed by the purchaser." The clear inference from the facts found in the majority opinion is that New Nassau assumed all liabilities of Old Nassau including its liability to minority stockholders and under the agreement the minimum liability so assumed was $40 a share. In my view the majority is incorrect in not including this liability as part of the basis of the assets acquired.

---

QUEALY, *J.*, dissenting: I must disagree with the opinion of the majority both with respect to the facts and with respect to the law.

With respect to the facts, the majority opinion concludes:

Reliance's purpose in purchasing the stock of Old Nassau was to acquire the underlying assets of that corporation through the vehicle of New Nassau. The organization of New Nassau, the transfer of all the assets of Old Nassau to New Nassau, and the accompanying transfer to Reliance of the stock of New Nassau in exchange for the stock of Old Nassau and the payments by New Nassau to minority shareholders of Old Nassau were each steps in a single plan to accomplish that purpose.

It must be recognized that whether Reliance continued to operate the business through Old Nassau as a subsidiary corporation or organized a new corporation for that purpose was of concern to the sellers of the stock of Old Nassau only insofar as it went to the security for the notes which they had taken in payment. The incorporation of and the transfer of the assets to New Nassau was not intended to meet any conditions imposed by the sellers. Its sole purpose was to meet the advice of Reliance's counsel that in so doing a "stepped-up"

basis could be obtained for the assets. Reliance always intended to operate the terminal through a subsidiary corporation and except for tax considerations Old Nassau would fulfill its objectives just as well as New Nassau.

In substance, there was nothing more than the purchase by Reliance of the stock of Old Nassau for cash. The second step, whereby Old Nassau transferred its assets to New Nassau in exchange for stock which was thereupon distributed to Reliance, had no business purpose. Its only purpose was to get a "stepped-up" basis for the assets of Old Nassau. As such, it may be disregarded. *Davant* v. *Commissioner*, 366 F. 2d 874 (C.A. 5, 1966).[1] In this respect, the facts are distinguishable from *The South Bay Corporation* v. *Commissioner*, 345 F. 2d 698 (C.A. 2, 1965), reversing 41 T.C. 888 (1964).

Furthermore, to treat the purchase of the stock of Old Nassau for cash and the transfer of its assets to New Nassau some 9 months later for stock as an "abortive" reorganization in order to give New Nassau a "stepped-up" basis for the assets is wholly incompatible with the objectives of the Congress in enacting section 334(b)(2). See *Pacific Transport Co.* v. *Commissioner*, 483 F. 2d 209 (C.A. 9, 1973). It puts us right back where we started from before the enactment of section 334(b)(2) as a part of the Revenue Act of 1954.

The purchase by Reliance of the stock of Old Nassau standing by itself did not change the basis for the underlying assets of Old Nassau. The addition of a second step whereby New Nassau was organized to take over such assets changed nothing. *Casco Products Corp.*, 49 T.C. 32 (1967). It was the type of "rinky dink" which has long been disregarded by the courts under the doctrine enunciated in *Gregory* v. *Helvering*, 293 U.S. 465 (1935).

[1] See also "A Proposed Treatment of Reincorporation Transactions," 25 Tax L. Rev. 282 (1970) ; Nicholson, "Recent Developments in the Reincorporation Area," 19 Tax L. Rev. 123 (1964) ; Rice, "When Is a Liquidation Not a Liquidation for Federal Income Tax Purposes ?," 8 Stan. L. Rev. 208 (1956).