O'MEALIA RESEARCH & DEVELOPMENT, INC.,[1] PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7003-73.    Filed June 26, 1975.

*Edward G. Hearn,* for the petitioner.
*Kenneth G. Gordon,* for the respondent.

[1] The case of O'Mealia Outdoor Advertising Corp., docket No. 7004-73, was originally consolidated herewith. However, pursuant to an agreement between the parties, all the disputed issues have been settled and an order of decision has been entered pursuant thereto.

QUEALY, *Judge:* The respondent has determined deficiencies in the income tax of O'Mealia Research & Development, Inc., for the fiscal years ending October 31, 1969, and October 31, 1970, in the amounts of $47,957 and $53,971.

Due to concessions by the parties, the sole question remaining for decision is whether petitioner is barred by section 269(a)(2)[2] from utilizing net operating losses incurred during its fiscal years 1964 through 1967 against profits realized in its fiscal years ending 1969 and 1970 where such profits were attributable to assets acquired by petitioner in 1968 through its parent corporation, O'Mealia Outdoor Advertising Corp. (hereinafter referred to as O'Mealia).

### FINDINGS OF FACT

Some of the facts have been stipulated. Such facts and the exhibits attached thereto are incorporated herein by this reference.

O'Mealia Research & Development, Inc. (hereinafter referred to as petitioner), is a New Jersey corporation whose principal place of business at the time of the filing of the petition herein was Jersey City, N.J. Petitioner timely filed its Federal corporate income tax returns for the fiscal years ending October 31, 1967, through October 31, 1970, with the District Director of Internal Revenue, Newark, N.J.

Petitioner was incorporated in 1963. From its inception until June of 1968, petitioner was engaged in the business of experimenting and developing various outdoor advertising devices that included lighting fixtures adaptable for use in outdoor advertising signs for illumination purposes, development of a photographic process to copy advertising copy that could be applied directly to outdoor advertising signs thus reducing the need for hand-painting, and development of a coordinated direct mail and outdoor advertising promotion scheme.

The issued and outstanding stock of petitioner was initially held and owned in the following proportions:

---

[2] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

| | Percent |
|---|---|
| Endre Fazekas | 25 |
| Thomas J. Nokes | 19 |
| Joseph Barrett | 5 |
| O'Mealia | 51 |
| | 100 |

In 1967, as a result of various acquisitions not relevant herein, O'Mealia became the owner of all the outstanding stock of petitioner.

O'Mealia was incorporated on May 1, 1954. At all times pertinent herein, it was engaged in the outdoor advertising business. Its business encompassed the erection and rental of poster panels, painted bulletin boards, and painted outdoor advertising displays, all of which required the periodic painting of advertising copy by the company's employees.

As of December 31, 1967, the following individuals owned and held all the issued and outstanding stock of O'Mealia:

| Stockholder | Number of shares |
|---|---|
| Harry O'Mealia | 4,370.75 |
| Annette Daley | 2,222.75 |
| Grace Nokes | 2,222.75 |
| Hugh F. McLaughlin | 2,211.75 |
| Irene V. Malone | 1,872.00 |
| Thomas J. Nokes | 1.00 |
| George Hagemiester | 1.00 |
| Martin J. Loftus | 1.00 |
| Total issued and outstanding shares | 12,903.00 |

Subsequently, in 1968, 2 other shares of stock of O'Mealia were issued, one each to August Barberi and John M. Stanton.

During the years in question, Harry O'Mealia was the president and chief executive officer of O'Mealia. Annette Daley and Grace Nokes were his sisters. Hugh F. McLaughlin was his nephew, Irene V. Malone, his aunt, and Thomas J. Nokes, his brother-in-law. George Hagemiester, John M. Stanton, Martin J. Loftus, and August W. Barberi were not related by blood or marriage to any of the other shareholders of O'Mealia.

On August 15, 1968, O'Mealia entered into an agreement with Outdoor Displays, a partnership, for the purchase of all its assets for the sum of $150,000. The agreement was effective as of June 1, 1968. Outdoor Displays was engaged in the business of leasing, maintaining, and renting bulletin boards and signs for outdoor

advertising. The assets of Outdoor Displays, including 69 bulletin boards, were transferred directly to petitioner who recorded such assets on its books and credited the sum of $150,000 as a liability owing to its parent, O'Mealia.

That same day and simultaneously therewith, O'Mealia also contracted to purchase 40 shares of stock in both Federal Advertising Corp. (hereinafter referred to as Federal) and Industrial Land & Development Co. (hereinafter referred to as Industrial) for the sums of $1,100,000 and $100,000, respectively. The agreement was effective as of June 1, 1968. The acquired stock represented 43 percent and 40 percent, respectively, of the issued and outstanding stock of the above corporations.

The agreement provided for the payment of $150,000 in cash, a promissory note in the sum of $91,500 payable on March 19, 1969, and a promissory note in the sum of $958,500 payable in 83 monthly installments commencing on April 1, 1969. The sellers of the above stock were neither related by blood or by marriage to any of the shareholders of O'Mealia.

Part of the above funds used by O'Mealia to pay for the stock of Federal was obtained by way of a loan from First Jersey National Bank in the amount of $350,000. The loan agreement recites that such money was to be used "to cover the cost of a down payment and related expenses for the purchase of the assets of Federal Advertising Corporation." Harry O'Mealia personally guaranteed the loan.

Both Federal and Industrial had two separate lines of business, outdoor advertising and real estate. Pursuant to the above purchase agreement, it was provided that as of June 1, 1968, the business and affairs of both corporations would be divided into an "advertising division," consisting of all the outdoor advertising assets and a "real estate and investment division," containing all the other assets exclusive of the outdoor advertising business assets. Separate books of account and records were to be kept for each division as of June 1, 1968.

It was provided by the parties to the agreement that in the event of any dispute concerning the application of income and the charging of expenses between the respective advertising divisions and real estate and investment divisions, the resolution thereto was to be made in accordance with the intent that the divisions would, as of June 1, 1968, be considered as separate entities. Pursuant to the above agreement, O'Mealia was entitled to place

two directors on the board of directors of each corporation. In addition, effective as of June 1, 1968, Harry O'Mealia was appointed general manager in charge of the advertising divisions of both corporations.

The agreement further provided that at any time subsequent to January 1, 1969, and prior to May 31, 1969, O'Mealia had the right to have its stock in Federal and Industrial redeemed in exchange for all the assets of the respective advertising divisions, subject to all the liabilities of said divisions, incurred after June 1, 1968. In the event that O'Mealia did not exercise its right to have the stock redeemed, the other stockholders of Federal and Industrial had the right, at any time subsequent to June 1, 1969, to cause the complete liquidation of Federal and Industrial. Upon such complete liquidation, O'Mealia agreed to accept, in lieu of its pro rata liquidating distributions, the assets of the respective advertising divisions subject to the liabilities incurred by said divisions after June 1, 1968.

In the event that O'Mealia acquired the assets of the respective advertising divisions of Federal and Industrial, it agreed to operate the same in conjunction with the assets and business of Outdoor Displays, which had been acquired contemporaneously with the execution of the above agreement. Initially, O'Mealia had wanted only to acquire the advertising assets of each corporation but the sellers were only willing to sell a portion of the stock which could then be specifically allocable to such assets.

In December of 1968, O'Mealia transferred the stock of Federal and Industrial to petitioner in consideration for the assumption by petitioner of the notes issued by O'Mealia in connection with its purchase of said stock. Such notes totaled $1,387,500 and included the sum of $337,500 then outstanding on its loan from First Jersey National Bank. Of the above liabilities assumed by petitioner, the sum of $187,500 was credited on O'Mealia's books against the $150,000 liability owing from petitioner on account of the transfer of the assets from Outdoor Displays.

On January 2, 1969, pursuant to the above agreement, petitioner acquired the assets of the advertising divisions of Federal and Industrial through the redemption of the stock transferred to it by O'Mealia. The parties have stipulated that the sequence of events which culminated in the receipt by petitioner of the assets of Outdoor, Federal, and Industrial was part of a single plan

aimed at the acquisition of such assets by petitioner with O'Mealia providing the necessary funds and financial backing. The parties have further stipulated that of the total purchase price paid for the acquisition of these assets, the sum of $1,225,000 was allocable to the billboards, signs, and other depreciable assets while the balance of $125,000 was allocable to goodwill.

For its fiscal years ending October 31, 1963, through October 31, 1968, petitioner's reported taxable income and losses on its corporate tax returns were as follows:

| FYE Oct. 31— | Taxable income |
|---|---|
| 1963 | ($67,665.47) |
| 1964 | (31,182.05) |
| 1965 | (26,317.81) |
| 1966 | 7,911.86 |
| 1967 | (218,810.96) |
| 1968 | (10,691.24) |

As a result of the 5-year limitation on the carryforward of losses, the total net operating loss available for petitioner's fiscal year ending October 31, 1969, was $287,002.06.

For its fiscal years ending October 31, 1969 and 1970, petitioner reported taxable income of $86,333 and $93,378, respectively. It utilized its net operating losses from 1964 through 1967 to offset, to the fullest extent, the taxable income reported for each of these years. Respondent has denied petitioner the benefit of such claimed net operating loss carryovers for the years in question.

In paragraph 32 of the stipulation of facts, the parties stipulated as follows:

The parties agree that the only issue in dispute is whether Research is entitled to deduct the net operating loss carryover, attributable to those fiscal years prior to the receipt of the assets of Outdoor, Federal and Industrial, in its fiscal years ending October 31, 1969 and 1970, respectively, pursuant to *Int. Rev. Code of 1954*, § 172 and the following language of *Int. Rev. Code of 1954*, §269(a)(2):

(2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, * * *

OPINION

Petitioner is engaged in the business of experimenting with and developing various outdoor advertising media. Its parent corporation, O'Mealia, is engaged in the outdoor advertising business involving the erection and rental of posters, bulletin boards, and other outdoor advertising displays.

In August of 1968, O'Mealia entered into an agreement with Outdoor Displays for the purchase of all its assets for the sum of $150,000. These assets, which included 69 bulletin boards, were transferred directly to petitioner who credited the purchase price on its books as a liability owing to its parent.

Simultaneously therewith, O'Mealia acquired approximately 40 percent of the issued and outstanding stock of Federal and Industrial each of whose businesses was divided into outdoor advertising and real estate activities. O'Mealia wanted to acquire the advertising assets of each of the corporations but the sellers were only willing to sell O'Mealia the stock specifically allocable to such assets. The purchase price of such stock was $1.2 million, payable $150,000 in cash and the balance in promissory notes.

In December of 1968, O'Mealia transferred the stock acquired from Federal and Industrial to petitioner with the petitioner assuming liability for the notes issued by O'Mealia in connection with such purchase. On January 2, 1969, petitioner acquired the advertising assets of Federal and Industrial through the redemption of stock pursuant to the terms of the original purchase agreement.

The parties have stipulated that the sequence of events which culminated in the receipt by petitioner of the goodwill and assets of Outdoor Displays, Federal, and Industrial, was part of a *single plan* aimed at the acquisition of such assets with O'Mealia providing the necessary funds and financial backing. The parties have further stipulated that the basis of these assets in the hands of petitioner was $1,225,000 with the balance of $125,000 allocable to goodwill.

The sole question before the Court, as limited by the parties in the stipulation of facts, is whether the basis of the assets acquired by petitioner as described above is determined "by reference to the basis in the hands of the transferor corporation" within the

meaning of section 269(a)(2).[3]

Despite the stipulation of facts, respondent argues that the purchase of assets and stock by O'Mealia and their subsequent transfer to petitioner by O'Mealia should be treated as separate and distinct transactions. Thus viewed, the transfer of the assets and stock to petitioner would be governed by section 351, with the basis of such items in the hands of petitioner determined by reference to O'Mealia. See sec. 362. The transfer would then fall within the above-cited language of section 269(a)(2).

It is apparent that if petitioner had purchased the assets itself, section 269(a)(2) would not apply. The statute itself requires this result where the basis of the acquired assets is a cost basis as opposed to a carryover basis applicable in cases of a nontaxable acquisition where the tax attributes flow with the acquisition. Further, respondent has ruled that he will not invoke the rationale of the decision in *Libson Shops, Inc. v. Koehler,* 353 U.S. 382 (1957), in this situation to ban the use of preacquisition net operating losses against postacquisition profits arising from the newly acquired assets where there has been no change in the stock ownership of the acquiring corporation during or after the period in which it incurred losses. See Rev. Rul. 63-40, 1963-1 C.B. 46. This is despite the fact that the acquiring corporation subsequently discontinues the business activity which produced these losses.

Based on the record as a whole and on the stipulation of facts, we find that the steps through which petitioner acquired the assets of Outdoor Displays, Federal, and Industrial fall within the "integrated transaction" doctrine as recently enunciated by this Court in *YOC Heating Corp.,* 61 T.C. 168 (1973). Thus, the basis of such assets in the hands of petitioner should be determined by reference to the cost of the assets and not by reference to the basis

---

[3] Insofar as material herein, sec. 269 provides as follows:

SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX.

(a) IN GENERAL.—If—

\* \* \*

(2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation,

and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance. \* \* \*

of the assets in the hands of O'Mealia as respondent contends. As such, we hold that section 269(a)(2) does not apply.

In view of the foregoing, we need not reach the further questions under section 269 of whether the proscribed purpose existed on the part of petitioner and if it did, whether the factual pattern in issue was the type whereby petitioner secured the benefit of a "deduction, credit, or other allowance" which it otherwise might not enjoy.

*Decision will be entered under Rule 155.*